## MYERS v. MYERS.

(Court of Appeals of District of Columbia. Submitted January 13, 1925. Decided April 6, 1925. Petition for Rehearing April 25, 1925.)

No. 1694.

I. Patents ⊗═109—Where leave to file amendment to preliminary statement is obtained on affidavits later shown to be untrue, it should be stricken.

Where leave to amend original statement, so as to change date of disclosure fixed therein, is obtained on affidavits later shown to have been at least mistakenly made, such amended preliminary statement should be stricken.

2. Patents ⊗═109—Application for leave to amend preliminary statements, changing date of disclosure, should be closely scrutinized.

Application to amend preliminary statement, so as to change date of disclosure, made after applicant has seen adverse party's dates, should be closely scrutinized.

3. Patents ⊗═91(3)—Evidence held to show applicant for patent was original inventor.

Evidence *held* to show applicant for patent was original inventor, as against claims of his brother, who had worked with him as employee.

4. Patents ⊗═93 — Though details of invention are worked out by employee of original inventor, result inures to benefit of employer.

Though details of invention are worked out by employee of original inventor, result inures to benefit of employer.

Appeal from Commissioner of Patents.

Interference proceeding between Charles W. Myers and Harry S. Myers. From decision awarding priority to the senior party, Charles W. Myers, the junior party appeals. Reversed, and priority awarded junior party.

W. D. Shoemaker and John Boyle, Jr., both of Washington, D. C., for appellant.

S. T. Cameron, L. H. Sutton, and W. B. Kerkam, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Appeal from a decision of the Patent Office in an interference proceeding awarding priority to the senior party and patentee, Charles W. Myers. The invention is defined in four counts, the first of which reads as follows:

"1. In a tractor of the farm type having an automotive organization, which includes a motor, propelling wheels, transmission gearing, also a differential gear, transmitting power from said motor to said wheels, a winding drum carried by the housing of the differential gear of said gearing, and gearing other than said transmission gearing, arranged to transmit power from the motor to said drum."

Counts 2 and 3, in addition, include a brake and clutch, such as usually form part of a properly designed winch, while count 4 merely defines the construction in greater detail.

The Examiner of Interferences and the Commissioner held "that the invention lay

in the idea of mounting the winch on the differential housing of the tractor and driving it from the belt pulley thereof, and the designing of the necessary gearing and connections was merely the work of a skilled mechanic and ancillary to the main invention." In this ruling we concur. Its material bearing will become apparent in the consideration of the issues involved.

The parties to this interference are brothers. Harry, the younger by some 17 years, was about 27 years old when the events leading up to this controversy occurred. It is apparent from the record that he possesses unusual mechanical ability. In fact, it is not too much to say that he is a genius in that line. When only 19 years of age he built an automobile out of old parts of cars and drove it for about a year. When in the fall of 1919 Mr. Frank H. Williams, who had unsuccessfully sought to have a winch attached to a Fordson tractor, talked with various persons as to the right man to consult, Harry Myers' reputation was such that his name was suggested. But while Harry, as indicated, possessed unusual mechanical skill, he had no more than a common school education and could not make drawings. His brother Charles, on the other hand, was a draftsman, although it is apparent that he did not possess the mechanical ability of Harry. Charles, however, did possess the entire confidence of his brother.

In 1919 Harry Myers was employed as foreman by the United Natural Gas Company in building bailing and drilling machines for use in gas fields, and was especially interested in the development of such machinery. Early in 1920 he left the employ of this company and equipped a small machine shop of his own for the purpose of developing his mechanical ideas. Through the efforts of Harry, Charles had been given employment as a bookkeeper by the gas company, and left at about the time Harry severed his connection with that company. Mr. Williams, a reputable and disinterested witness, made known to Harry about this time his desire to have a Fordson tractor equipped with a winch. This witness says: "After talking with Mr. Myers on two or three occasions, he thought that he understood what we wanted on the tractor and told me that he would go ahead and make it. Some time afterwards Mr. Myers wrote me a letter, asking me to get him a tractor at cost to experiment with. That I could not do. He afterwards bought the tractor with me at the regular price, and I met Mr. Myers at different times, and he told me that his brother,

Charles Myers, would make a drawing of it." The witness replied in the affirmative when asked whether Harry ever gave him any definite ideas as to how he proposed to make the tractor attachment. He stated that Harry had taken pencil and paper and made a drawing offhand, which he explained to the witness by referring to a tractor standing on the floor in the rear of the garage.

Mr. Earl M. Bowen, also a disinterested witness, and the proprietor of a Ford sales and service station at Oil City, Pa., testified that he talked with Harry Myers about a winch attachment for a Fordson tractor in the fall of 1919, and that about the middle of March of 1920 Harry came to his place "to make measurements on a tractor to get out his first model. At that time he told me he was going to attach it to the differential housing of the Fordson tractor."

David L. Bowen, a Ford dealer at Youngsville, Pa., testified that just previous to the wedding anniversary of witness, on March 27, 1920, during a conversation with Harry Myers, Harry informed him, in the presence of a Mr. Fornof, "that he would have an oil well pulling outfit to go on the back of the Fordson tractors, and it would be driven with a belt pulley." Mr. Fornof corroborated this witness.

In addition to the purchase of the tractor, to which a winch was attached, and forming one of the elements of the combination defined in the counts, Harry Myers purchased and paid for all the materials that went into the winch. This is not even controverted. Harry testified that, after he had conceived the idea of equipping a tractor with a winch attachment, he asked his brother to assist him in building the winch, "which he consented to do, and he came to work for me, building drilling engines and work on the winch. Charlie Myers is a draftsman, and I am not much of a draftsman. I asked him if he would draw up sketches on this winch, and he consented to do so." This arrangement was entered into some time in March of 1920, and there are bank checks in evidence, drawn by Harry in favor of his brother, clearly indicating that Charles sustained the relation of employee to Harry until some time in June of 1920, notwithstanding the contention of Charles to the contrary.

The evidence of Harry Myers further establishes that during the latter part of March or early April of 1920 the Myers brothers went to the place of business of the witness Williams for the purpose of making measurements from a tractor, to be used in

preparing a sketch of the proposed invention. Harry testifies, and in this is corroborated by Mr. Williams, that upon request Mr. Williams supplied them with a large envelope and a yardstick; that Harry made the measurements, and Charles made a rough drawing on the envelope, upon which he noted these measurements. This drawing, of which we shall have more to say, is identified as Chas. Myers' Exhibit No. 1. A more detailed drawing subsequently was made by Charles and completed in May of that year. The invention then was embodied in a machine, which was successfully tried out immediately. The two brothers were present, and Harry operated the machine.

During this same period Harry Myers was developing a drilling engine, and Edward R. Inman, a patent solicitor, but not a member of the bar, was employed to prepare applications for patents on this and the winch attachment. The evidence as to subsequent occurrences is conflicting, but it does appear that at the suggestion of Charles Myers the winch application was filed first, and that he was named as the inventor therein. When Harry discovered this, he wrote a protesting letter to the Patent Office, and subsequently wrote other letters to the same effect. It is apparent from the testimony of Mr. Inman, who happens to be totally deaf, that he actively aided Charles throughout the controversy here in issue, and still appears as attorney of record for him. We shall refer to this deafness again.

The patent to Charles duly issued on May 24, 1921, and on November 30th following Harry, who meanwhile had employed other counsel, filed the application herein, which of course resulted in an interference. In his preliminary statement Harry alleged conception of the invention about the 1st of March 1920; that drawings were begun about the last of April, and completed about May 5th of that year; that he disclosed the invention to others about March 15, 1920, and subsequently to Charles; that a full-size embodiment of the invention was completed about the last of May, 1920, and successfully tested in June of the same year.

The preliminary statement of Charles, prepared by Mr. Inman, who was almost as familiar as Charles with every phase of the controversy, and who had been supplied by Charles with all the information then deemed material, alleged that the first drawing of the invention was made on or about May 5, 1920, and gave the date of the first written description thereof as on or about June 3, 1920; "that the date upon which the invention was first disclosed to others was on or about May 5, 1920," and reduction to practice as on or about June 1, 1920.

These preliminary statements were approved March 10, 1922, and thereupon each party had access to the other's statement. On May 20th, following, Charles moved for leave to amend his original statement, changing his date of disclosure from May 5, 1920, to the period between October 15 and December 1, 1919. In support of this motion there were filed affidavits made by Inman, Charles Myers, and William F. Rumberger, a brother-in-law of Charles. In substance Rumberger stated in his affidavit that, after the controversy between these brothers became acute and public, it occurred to him in May of 1922 that Charles "had disclosed his ideas about the structure of the winch to affiant in the fall of 1919." The affidavit fails to mention Rumberger's relationship to Charles Myers, nor does it explain the measure of intimacy existing between them. Charles, in his affidavit, states that, in compliance with instructions from his attorney, Inman, he had "made careful and thorough search of all the papers and records" in his possession, and had given his attorney all the data he was able to obtain; that since the filing of his preliminary statement he had received from Rumberger the information detailed in the latter's affidavit.

Counsel for Harry Myers vigorously opposed the allowance of this amendment and have pressed their objection throughout the proceeding. When testimony was taken, it developed that the alleged disclosure to Rumberger was through the medium of the rough drawing on the envelope identified as Chas. Myers' Exhibit No. 1. The evidence for Harry Myers in rebuttal so conclusively establishes that this envelope was not in existence until some time in March of 1920, although Rumberger and Charles Myers had testified positively to the making of the drawing thereon in the fall of 1919, that counsel for Charles concede that these witnesses must be "mistaken." We think this is too mild a characterization of the testimony of Rumberger and Charles Myers on this point, and in this regard the tribunals of the Patent Office seem in accord. The Examiner of Interferences said: "If all of the facts now in the record had been before the Examiner when C. W. Myer's motion to amend his preliminary statement was considered no justification for permitting said amendment would be apparent."

On this point the Examiners in Chief said: "That Exhibit No. 1 was not made till

1920 is believed obvious from the above testimony, and that the envelope was not in existence till March, 1920, is conclusively proved by other rebuttal testimony; hence all testimony as to the drawing being made, Exhibit No. 1, in 1919, is erroneous as to date or false, or some other drawing not in evidence was made."

The Commissioner referred to this point as follows: "It is not deemed necessary to discuss all the discrepancies between the statements made in the affidavits filed in support of this motion and the testimony of Charles Myers and Rumberger, who executed the affidavits. It is sufficient to say, after a careful consideration of the affidavits and the testimony, that Charles Myers is utterly discredited as to his testimony with reference to having made a 'dimension' drawing on an envelope like the drawing shown in his 'Exhibit No. 1' in the fall of 1919, or having shown such a drawing to other people at that time, or a drawing identical with or like his Exhibit No. 2."

[1] The Examiner of Interferences, in a painstaking and very satisfactory opinion, while he did not strike the amended preliminary statement, awarded priority to Harry Myers. The other two tribunals, however, awarded priority to Charles. In other words, notwithstanding that such a finding would not have been possible under the original preliminary statement of Charles, and notwithstanding that his amended preliminary statement was procured under circumstances already detailed, and should have been stricken from the record when those circumstances were developed, the Patent Office has permitted the party thus imposing upon it to profit by the imposition.

[2] The obvious purpose of a preliminary statement is to obtain from the parties an honest statement as to the dates of conception, disclosure, and reduction to practice, and applications to amend such a statement, after one party has seen the other's dates, should be closely scrutinized. Under rule 113 of the Patent Office, such amendments are to be allowed only "in case of material error arising through inadvertence or mistake, * * * upon a satisfactory showing that the correction is essential to the ends of justice." This rule clothes the Patent Office, as it should, with discretion to permit an amendment arising through honest inadvertence or mistake, to permit and not to thwart justice.

We well might rest our decision here, for the testimony of Charles Myers is so discredited as to render it of no practical value.

In Emerson v. Riley, 41 App. D. C. 480, 494, we said: "Since there is such a sharp issue of fact in this case, it is apparent that the surrounding circumstances and the inherent probability or improbability of the testimony must have a material bearing upon the outcome. Beals v. Finkenbiner, 12 App. D. C. 23. And where it clearly appears that a witness has willfully testified falsely as to a given point, his entire testimony is entitled to little consideration, for 'courts are bound by principles of law, morality, and justice to apply the maxim, "falsus in uno, falsus in omnibus." ' Alexander v. Blackman, 26 App. D. C. 541; Campbell v. State, 3 Kan. 498; Dell v. Oppenheimer, 9 Neb. 457, 4 N. W. 51; Stoffer v. State, 15 Ohio St. 56, 86 Am. Dec. 470. The theory upon which this rule is founded is not that a witness who has willfully perjured himself is incapable of speaking the truth as to other facts, but rather that the motive that prompted him to commit perjury in one part of his testimony *may* lead him to support it by falsifying other parts. In other words, courts have found it unsafe to base an award upon the testimony of such a witness."

[3, 4] But there are other grounds upon which to base a reversal of the decision below. When Harry Myers, at a time prior to the earliest date that may be given to his brother Charles under any view of the evidence, disclosed to the witnesses whose testimony we have reviewed the broad idea of mounting a winch on the differential housing of a tractor and driving it from the belt pulley on the tractor, a disclosure of the invention was made, and the working out of the mechanical details was merely ancillary to the invention. Even assuming, therefore, that Charles assisted in the working out of such details, the result inured to the benefit of his employer, Harry Myers. Neth v. Ohmer, 30 App. D. C. 478. Moreover, all the circumstances preceding reduction to practice point to Harry as the real inventor. He possessed far greater ability in this line, the desirability of such an invention was made known to him first, he equipped a shop where the work actually was done, he purchased at considerable expense a tractor and all the materials that went into the embodiment of the invention, and his evidence is from disinterested witnesses. His own testimony is consistent and reasonable, and, upon the whole record, we think it conclusively appears, as already indicated, that he was in fact the original inventor.

It is in evidence that, after the issuance

of the patent to Charles, Harry paid him various sums of money which Charles contends constituted an acknowledgment of his inventorship. Harry, on the contrary, contends that these payments were nothing more than ·commissions to Charles for selling winch attachments. The testimony of Mr. Inman on this point tends to corroborate Charles, but, as already noted, Mr. Inman is totally deaf, and communication with him necessarily very difficult, except through the medium of written notes, and no such notes have been produced. In other circumstances, greater significance would have attached to the attitude of Harry at that time; but, when the situation of the parties is considered, it is not strange that Harry should have been led into the action under discussion. He was protesting, even then, against the injustice done him, and his subsequent conduct clearly indicates that he at all times believed himself to be the real inventor. It may be that, owing to his lack of knowledge of patent law, he was led to believe that what Charles had done constituted his brother a joint inventor with him, even though no legal basis for such a belief existed. However this may be, we have no hesitancy, upon the whole record, in ruling that Harry, and not Charles, was the real inventor.

The decision is reversed, and priority awarded Harry Myers.

Reversed.